UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FILED

JUN 1 3 2013

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| JACK FRISON, SR., | ) | **4:13CR00231RWS** |
| | ) | |
| Defendant. | ) | |

## INDICTMENT

## COUNT ONE

The Grand Jury charges that:

At all times relevant to this Indictment:

### INTRODUCTION

1.      Jack Frison, Sr., ("FRISON") lived in St. Louis County, in the Eastern District of Missouri.

2.      FRISON owned, operated and controlled the business operations of a business known as the Frison Flea Market, Inc. ("the Frison Flea Market"), which is and was a registered Missouri corporation.

3.      The Frison Flea Market was located at 7025 Saint Charles Rock Road, Pagedale, Missouri 63133, in the Eastern District of Missouri.  The Frison Flea Market operated primarily as a facility in which dozens of vendors sold goods from booths within the premises.  The Frison Flea Market was typically open three days each week – Friday, Saturday, and Sunday.  FRISON was typically present at his flea market during the hours of operation.

4.      From at least 2006, and continuing until at least June 2012, substantially all of FRISON's reported personal income came from the Frison Flea Market.

5.      FRISON made money through the Frison Flea Market by: 1) charging vendors a fee for the use of sales booths within his flea market; and 2) charging customers an entry fee to enter his flea market – typically $1.00 per customer.  The amount FRISON charged for vendor booth fees varied depending upon the location and size of the booth.

6.      From at least 2004, and continuing until at least June 2012, FRISON knowingly facilitated, aided, and abetted a substantial number of vendors in the open sale of counterfeit goods at the Frison Flea Market.  Such counterfeit goods included counterfeit clothing, footwear, and accessories such as purses, as well as illegal copies of copyright protected movies and music.

7.      Counterfeit clothing, footwear, and accessories sold at the Frison Flea Market bore marks – trademarks and service marks – identical to and substantially indistinguishable from marks that were in use and registered on the principal register of the United States Patent and Trademark Office.  At no time did the owners of such marks authorize or permit FRISON or any of the vendors of his flea market to sell and offer for sale such counterfeit goods.

8.      Counterfeit movies and music sold at the Frison Flea Market included works for which the owners of such works had obtained copyright protection from the Library of Congress.  At no time did the owners of such copyrights authorize or permit FRISON or any of the vendors of his flea market to sell and offer for sale such counterfeit goods.

9.      FRISON routinely met with vendors and walked around the premises of his flea market.  FRISON knew through his personal contacts with such vendors that a substantial number of vendors were selling counterfeit goods in the Frison Flea Market.

10.     FRISON also knew and had been advised that vendors were selling, and had continued to sell, counterfeit goods within the Frison Flea Market in violation of the law.  For example:

A.     In or around June 2003 and again in July 2004, FRISON was personally advised by representatives of the Recording Industry Association of America ("RIAA") that numerous vendors were selling illegal copies of music within his Frison Flea Market. FRISON was advised that this conduct was illegal and criminal under federal law.

B.     In or around October 2007, federal agents executed search warrants directed at certain vendors within the Frison Flea Market who were selling counterfeit clothing and related items.  For example, in October 2007, a person referred to herein as Vendor 1, and whose identity is known to the Grand Jury, maintained a sales booth rented from FRISON and which Vendor 1 operated at the Frison Flea Market.  From that sales booth Vendor 1 openly sold and offered for sale counterfeit clothing and related items.

C.     In December 2010, FRISON and his Frison Flea Market were sued by Coach, Inc. and Coach Services, Inc. ("Coach"), for trademark infringement relating to the sale of counterfeit Coach merchandise by vendors at the Frison Flea Market.

D.     On or about February 24, 2012, FRISON provided a tour of the Frison Flea Market to an individual who, unbeknownst to FRISON, was an undercover investigator, referred to herein as "UC."  During that tour, UC explained to FRISON that UC was looking for a booth from which to sell counterfeit iPhones® which included a counterfeit Apple trademark.  During that tour, FRISON generally explained to UC his booth rental policies and terms and the amount of money he made as a result of vendors at

3

his flea market.  At no time did FRISON advise UC that he did not permit the sale of counterfeit goods within his flea market.

        E.      On or about February 24, 2012, during the above-noted tour, UC showed FRISON a sample counterfeit iPhone® and FRISON accepted the counterfeit iPhone® from UC knowing it to be counterfeit and believing that UC intended to sell such counterfeit items at the Frison Flea Market.

        F.      On or about May 13, 2012, UC returned to the Frison Flea Market to begin selling counterfeit iPhones®.  While discussing booth space availability with UC, FRISON advised in substance that he would prefer if vendors did not refer to counterfeit iPhones as fake, but rather he directed that they use the term "look alike."  FRISON required UC to sign a form stating that UC would not commit any trademark "enfranchment" which he had no intention of enforcing because he thereafter permitted UC to operate a booth within the Frison Flea Market and to openly sell counterfeit iPhones®.

CONSPIRACY

11.      Beginning no later than 2003, and continuing until on or about June 22, 2012, the exact dates being unknown to the Grand Jury, within the Eastern District of Missouri and elsewhere,

**JACK FRISON, SR.,**

the defendant herein, along with others known and unknown to the Grand Jury, did knowingly conspire, combine, confederate, and agree with each other to 1) intentionally traffic in counterfeit goods and to knowingly use counterfeit marks on and in connection with such goods, and to willfully and for the purpose of private financial gain, in violation of Title 18, United States Code, Section 2320, and to 2) willfully and for the purpose of private financial gain infringe the

4

copyright of one or more copyrighted works; to wit, by reproducing and distributing and offering for distribution ten (10) or more copies of copyrighted works, including DVD copies of movies, the copyrighted works having a total retail value of more than $2,500, in violation of Title 18, United States Code, Section 2319(b)(1), and Title 17, United States Code, Section 506(a)(1).

## MANNER AND MEANS OF THE CONSPIRACY

12.     It was part of the conspiracy that co-conspirators, known and unknown, paid a rental fee to FRISON to rent and operate sales booths within the Frison Flea Market from which counterfeit goods were openly sold to customers who paid an entry fee to shop in the Frison Flea Market.

13.     It was part of the conspiracy that co-conspirators, known and unknown, obtained counterfeit clothing items, including shirts, pants, footwear, purses and other accessories that were sold and offered for sale at booths within the Frison Flea Market.  Many of the counterfeit items, including purses, were of such price, quality, and appearance that it was readily apparent that the items were counterfeit.  Several vendors openly sold counterfeit purses bearing marks owned by makers of luxury items, including marks owned by Coach, Louis Vuitton, Dolce & Gabbana, and numerous others.

14.     It was part of the conspiracy that co-conspirators, known and unknown, obtained, copied, and distributed counterfeit copies of copyrighted works, including movies and music, by offering such copyrighted works for sale at booths within the Frison Flea Market.  Typically, such copyrighted works were copied ("burned") onto DVDs or CDs, packaged, and sold to members of the public.  Some of the counterfeit and bootleg DVDs were of movies that were still showing "first run" in theaters and had not yet been generally released on DVD.  The counterfeit

5

and bootleg copies were of such price, quality, and appearance that it was readily apparent that the copies were not authorized copies.

15.     It was part of the conspiracy that FRISON knowingly facilitated, aided, and abetted co-conspirators, known and unknown, to continue to traffic in counterfeit goods at his flea market despite being advised that such sales were unlawful.  FRISON posted warnings within his flea market against trademark infringement to provide a false cover and to give an appearance of legitimacy, when in truth, FRISON did not remove vendors who were openly selling counterfeit goods within the premises he operated and controlled because it was not in the mutual best interests of FRISON and the vendors to cease selling counterfeit goods.

16.     It was part of the conspiracy that, at times, FRISON participated in determining and limiting the prices charged for the counterfeit goods sold by competing vendors within the Frison Flea Market.

17.     It was part of the conspiracy that co-conspirators, known and unknown, paid a fee to FRISON for the purpose of securing the use of a booth to sell counterfeit goods in the Frison Flea Market.

18.     It was part of the conspiracy that FRISON charged a fee to members of the public who desired to shop for counterfeit goods within the Frison Flea Market.

19.     As a result of the conspiracy, both FRISON and his vendors made money and personally profited from the open sale of counterfeit goods within the Frison Flea Market.

OVERT ACTS

20.     In furtherance of the conspiracy, one or more co-conspirators committed the following overt acts, among others, within the Eastern District of Missouri.

6

A.      In or around December 2010, after FRISON and the Frison Flea Market had been sued by Coach for trademark infringement, FRISON directed that no more Coach brand items be sold in the Frison Flea Market.  After this direction, FRISON continued to permit vendors to openly sell other counterfeit purses and items, including vendors who he knew were previously selling counterfeit Coach brand items.

B.      In or around December 2010, after FRISON and the Frison Flea Market had been sued by Coach for trademark infringement, FRISON required vendors in the Frison Flea Market to pay him additional money, in some cases $500.00, to assist him as a result of the lawsuit.

C.      In or around October 2011, a person referred to herein as Vendor 2, and whose identity is known to the Grand Jury, rented and operated a sales booth at the Frison Flea Market.  From that sales booth Vendor 2 openly sold and offered for sale counterfeit purses and related items.

D.      On or about January 27, 2012, a person referred to herein as Vendor 3, and whose identity is known to the Grand Jury, operated a booth at the Frison Flea Market and was openly selling and offering for sale counterfeit DVD copies of copyright protected movies for a price of six movies for $10.00.

E.      On or about January 27, 2012, a vendor whose identity is unknown to the Grand Jury, operated booth number 485 at the Frison Flea Market and was openly selling and offering for sale counterfeit DVD copies of copyright protected movies for the price of three movies for $5.00.

7

F.      On or about June 22, 2012, Vendor 2 maintained a sales booth rented from FRISON and which Vendor 2 operated at the Frison Flea Market.  From that sales booth Vendor 2 openly sold and offered for sale counterfeit purses and related items.

G.      On or about June 22, 2012, a person referred to herein as Vendor 4, and whose identity is known to the Grand Jury, maintained a sales booth rented from FRISON and which Vendor 4 operated at the Frison Flea Market.  From that sales booth Vendor 4 openly sold and offered for sale counterfeit purses and related items.

H.      On or about June 22, 2012, a person referred to herein as Vendor 3 maintained a sales booth rented from FRISON and which Vendor 3 operated at the Frison Flea Market.  From that sales booth Vendor 3 openly sold and offered for sale counterfeit DVD copies of copyright protected movies.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

The Grand Jury further charges that:

Between on or about January 27, 2012 and on or about June 22, 2012, within the Eastern District of Missouri,

### JACK FRISON, SR.,

the defendant herein, during any 180-day period, did aid and abet others known and unknown to the Grand Jury who willfully and for the purpose of private financial gain infringed and attempted to infringe the copyright of one or more copyrighted works; to wit, by reproducing and distributing, and offering for distribution, at least ten (10) copies of copyrighted works, including DVD copies of movies, the copyrighted works having a total retail value of more than $2,500.

In violation of Title 17, United States Code, Section 506(a)(1)(A) and Title 18, United

States Code, Sections 2319(b)(1) and 2.

## COUNT THREE

The Grand Jury further charges that:

On or about June 22, 2012, in the Eastern District of Missouri,

### JACK FRISON, SR.,

the defendant herein, did aid and abet persons known and unknown to the Grand Jury who did

intentionally traffic in and attempt to traffic in goods, including purses, knowingly using on and

in connection with such goods one or more counterfeit marks, including spurious marks identical

to and substantially indistinguishable from marks owned by Gado S.r.l. Limited Liability

Company Italy, including the mark "D&G DOLCE & GABBANA," which marks are and were in

use and are and were registered for such goods on the principal register of the United States

Patent and Trademark Office, the use of which counterfeit marks are and were likely to cause

confusion, to cause mistake, and to deceive.

In violation of Title 18, United States Code, Sections 2320(a) and 2.

### FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1.      Pursuant to Title 18, United States Code, Section 2323, upon conviction of a

conspiracy to commit an offense, or conviction of an offense, in violation of Title 18, United

States Code, Sections 2320 or 2319(b)(1), or Title 17, United States Code, Section 506(a)(1) as

set forth in Counts One, Two and Three, the defendant shall forfeit to the United States of

America any article, the making or trafficking of which is prohibited by any statute identified in

Title 18, United States Code, Section 2323(a)(1)(A); any property used or intended to be used in

9

any manner or part to commit or facilitate the commission of said offense; and any property

constituting or derived from any proceeds obtained directly or indirectly as a result of the

commission of said offense.

2.      Subject to forfeiture is a sum of money equal to the total value of any property,

real or personal, constituting or derived from any proceeds traceable to said offense.

3.      Specific property subject to forfeiture includes, but is not limited to, the

following:

> a.      One 2012 Porsche Panamera, VIN: WPOAA2A79CL018475;
>
> b.      One 2009 Rolls Royce Phantom, VIN: SCA2D68539UX16209;
>
> c.      One 2007 Jeep Commander, VIN: 1J8HG48K37C653662;
>
> d.      One 2006 Land Rover Range Rover, VIN: SALMF13436A233290;
>
> e.      $41,657.72 in U.S. Currency;
>
> f.      $33,258.00 in U.S. Currency;
>
> g.      $7,015.24 in funds from bank account # xxxxxx6872 at Regions Bank;
>
> h.      $2,881.56 in funds from bank account # xxx321 at Frontenac Bank; and
>
> i.      $2,752.43 in funds from bank account # xxx182 at Frontenac Bank.

4.      If any of the property described above, as a result of any act or omission

of the defendant:

> a.      cannot be located upon the exercise of due diligence;
>
> b.      has been transferred or sold to, or deposited with, a third party;
>
> c.      has been placed beyond the jurisdiction of the court;
>
> d.      has been substantially diminished in value; or

     e.     has been commingled with other property which cannot be divided without

difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to

Title 21, United States Code, Section 853(p).


A TRUE BILL.


_____

FOREPERSON

RICHARD G. CALLAHAN
United States Attorney


_____
JOHN M. BODENHAUSEN, #49568MO
Assistant United States Attorney


11